IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

JONE MARIE DIXON                                                    PLAINTIFF

V.                                          CIVIL ACTION NO. 1:19-CV-167-SA-DAS

ALCORN COUNTY, MISSISSIPPI and
JIMMY MCGEE                                                        DEFENDANTS

ORDER AND MEMORANDUM OPINION

On September 12, 2019, Jone Dixon initiated this action by filing her Complaint [1] against

Alcorn County and Jimmy McGee (in his individual capacity and his official capacity). Dixon

alleges her previous employment with Alcorn County was unlawfully terminated in violation of

her First Amendment rights and the Age Discrimination in Employment Act ("ADEA"). She also

asserts a state law claim for malicious inference with employment against McGee in his individual

capacity. Now before the Court is Alcorn County's Motion for Summary Judgment [64], as well

as Jimmy McGee's Motion for Summary Judgment [66]. Both Motions [64, 66] have been fully

briefed and are ripe for review.

*Relevant Factual and Procedural History*

Jone Dixon is a 67-year-old female. In January 2000, she began working for Alcorn County

as a Deputy Clerk for the Justice Court. Dixon held that position for approximately ten years until

the Board of Supervisors promoted her to the position of Justice Court Clerk in or around 2010.

She served as the Justice Court Clerk until she was terminated from that position on May 7, 2018.

As the Justice Court Clerk, Dixon was responsible for various matters at the Justice Court,

including but not limited to maintenance of the court records and other clerical duties. Alcorn

County has two Justice Court Judges. During Dixon's tenure as Clerk, the two longstanding Judges

were Steve Little and Jimmy McGee. Dixon's working relationship with the Judges (especially McGee) is at issue in this case.

Dixon alleges that, during her tenure as Justice Court Clerk, McGee oftentimes failed to show up on days when court was scheduled. She also contends that he would simply never issue a ruling in cases that had been taken under advisement. Furthermore, Dixon avers that on at least ten occasions McGee made comments regarding how the Justice Court needed younger women working in the Clerks Office.

In early 2018, Dixon complained about McGee to Greg Younger, who served as the Alcorn County Chancery Clerk. Dixon contends that she told Younger about McGee's failure to timely dispose of cases and that she believed the County needed to appoint a special judge to handle McGee's caseload. Regarding this conversation, Younger testified:

> Jone approached me, I don't know if it was in person or by phone, and related to me that Judge McGee had several absences over a period of time and that their workload was backed up and they were having attorneys complain and things of that nature.

[66], Ex. 1 at p. 8.

When questioned about what he did with the information learned from Dixon, Younger testified "I can't recall specifically. I probably would have related it to the supervisors, but I can't recall that specifically." *Id.* at p. 10. Dixon contends that Younger disclosed the information to a member of the Board of Supervisors, who in turn relayed her complaint back to McGee.

Also in early 2018, a complaint was lodged against McGee with the Mississippi Commission on Judicial Performance. The complaint concerned McGee's purported failure to timely dispose of cases. Dixon alleges that, as part of its investigation, the Commission sought from her the file for a case on which McGee had not made a ruling.

2

Concerning her communications with the Commission, Dixon testified via affidavit as follows:

> In early 2018, I was contacted by attorneys from the Mississippi Commission on Judicial Performance and asked to provide the case file for a case that Judge McGee had not made a ruling on. I told them that there were numerous other cases that Judge McGee had similarly not made a ruling on. They told me they wanted to see those files as well. I provided these files to them and they made copies of the files.

[70], Ex. 12.

Dixon avers that shortly after she spoke with the Commission, McGee called her, accused her of reporting him, and said that she would "be sorry" for doing so. McGee denies making such a statement and testified that he never thought Dixon reported him to the Commission. Contrary to McGee's denial, Dixon contends that Judge Little told her that McGee was mad at her; in addition, she contends that one member of the Board of Supervisors, Tim Mitchell, told her that "Jimmy McGee is on a witch hunt." [66], Ex. 2 at p. 65, 71.

The Alcorn County Board of Supervisors is comprised of five members. At all times pertinent to this case, the members were Lowell Hinton, James Voyles, Tim Mitchell, Steve Glidewell, and Jimmy Tate Waldon. On May 7, 2018, McGee spoke to the Board of Supervisors in executive session regarding Dixon's job performance. Little also participated in the meeting via phone. Dixon was not present for the meeting. According to various Board members, McGee reported to them that Dixon was holding court without a judge being present and was rude to people who owed fines. Ultimately, according to Supervisor Hinton, McGee told the Board that "he couldn't work with the lady any longer." [66], Ex. 9 at p. 9. According to Supervisor Glidewell, Little and McGee "both confirmed that Jone had been opening court on her own and she had been signing judgments in their place[.]" [64], Ex. 4 at p. 14. At the conclusion of the executive session,

3

the Board unanimously voted 4-0-1 (with Supervisor Waldon abstaining) to terminate Dixon's employment.

Also during the May 7, 2018 meeting, the Board unanimously voted to appoint Donna Taylor, a 52-year-old female, as the Interim Justice Court Clerk. Taylor had served as a Deputy Clerk under Dixon for a significant period of time, and Dixon had previously complained to the Board about Taylor's poor work performance on multiple occasions. A short time later, Briony Mitchell, a 39-year-old female, became the permanent Justice Court Clerk.

After exhausting her administrative remedies, Dixon initiated this action against Alcorn County and McGee (in his official and individual capacities). As to the County, Dixon asserts claims pursuant to the ADEA and unlawful retaliation under the First Amendment. She also alleges a First Amendment retaliation claim against McGee, as well as a state law claim for malicious interference with employment.[1]

### Summary Judgment Standard

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the

---

[1] Dixon initially asserted various other claims against the County and McGee but has withdrawn those claims with the above-referenced claims being the only ones remaining in this litigation.

absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Management of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalist arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

As noted above, both the County and McGee seek dismissal of the respective claims asserted against them. The Court will first address Dixon's ADEA claim and First Amendment retaliation claim against the County and then turn to her First Amendment retaliation and malicious interference with employment claim against McGee.[2]

---

[2] As noted above, Dixon has also named McGee, in his official capacity, as a defendant. However, while the caption of the Amended Complaint [28] lists as a defendant McGee in both his individual and official capacity, the body of the Amended Complaint [28] appears to only address individual capacity claims against McGee. "Claims against officers in their official capacity are essentially duplicates of the claims against the governmental entity." *Sharkey v. Humphreys Cnty., Miss.*, 2020 WL 3965975, at *3 n. 4 (N.D. Miss. July 13, 2020) (citing *Estate of Manus v. Webster Cnty.*, 2014 WL 1285946, at *2 (N.D. Miss. Mar. 31, 2014) (reversed in part on reconsideration on other grounds); *see also Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 n. 55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (noting that official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent"). Because Dixon's official capacity claims against Alcorn County are synonymous with her municipal claims against Alcorn County, the official capacity claims are duplicative. Therefore, to the extent that Dixon's Amended Complaint [28] includes official capacity claims against McGee, they are hereby dismissed at the outset.

I.    *ADEA Claim Against Alcorn County*

In her Amended Complaint [28], Dixon avers that Alcorn County is liable under the ADEA "because it knowingly allowed Defendant McGee to terminate her from her position as Justice Court Clerk because of her age or blindly accepted his age-based request." [28] at p. 7. The ADEA makes it unlawful for an employer to "discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). "To establish an ADEA claim, 'a plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision.'" *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)).

"In analyzing an ADEA claim, the court employs the *McDonnell Douglas* burden-shifting framework." *Vanderberg v. Rexam Beverage Can Co.*, 2017 WL 507610 at *3 (N.D. Miss. Feb. 7, 2017) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Applying the *McDonnell Douglas* framework, "a plaintiff relying on circumstantial evidence must put forth a *prima facie* case, at which point the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." *Moss*, 610 F.3d at 922 (quoting *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007)). Then, "[i]f the employer articulates a legitimate, non-discriminatory reason for the employment decision, the plaintiff must then be afforded an opportunity to rebut the employer's purported explanation, to show that the reason given is merely pretextual." *Id*. (citing *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378-79 (5th Cir. 2010)).

A. *Prima Facie Case*

In order to establish a *prima facie* case of discriminatory termination under the ADEA, Dixon must show that she: (1) was discharged; (2) was qualified for the position; (3) was a member of the protected class; and (4) was either replaced by someone younger, replaced by someone outside the protected class, or otherwise discharged because of her age. *Ruth v. Eka Chemicals, Inc.*, 92 F. Supp. 3d 526, 530 (N.D. Miss. Feb. 17, 2015) (citing *Phillips v. Leggett & Platt, Inc.*, 658 F.3d 452, 455 (5th Cir. 2011); *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004)).

Alcorn County appropriately concedes that Dixon has established a *prima facie* case for summary judgment purposes. This is true because Dixon, a 67-year-old female, was discharged from her position as Justice Court Clerk, a position which she was qualified for and had held for almost a decade, and was replaced by Donna Taylor, who was younger than her. Dixon has carried her burden as to the *prima facie* case.

B. *Legitimate, Non-discriminatory Reasons*

The burden then shifts to Alcorn County to provide a legitimate, non-discriminatory reason for the employment decision. *See Moss*, 610 F.3d at 922. At this stage, Alcorn County's burden is simply to produce "evidence, which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Ruth*, 92 F. Supp. 3d at 531 (quoting *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002)) (additional citation and emphasis omitted). Alcorn County contends that it "had numerous legitimate, non-discriminatory reasons for firing Dixon." [65] at p. 5. The County states that "[t]he single-most important reason was that Dixon would sign judgments in the place of the justice court judges." *Id*. In addition, Alcorn County contends that McGee and Little both complained that Dixon would "run court" when they were

7

not there, that many of the Deputy Clerks complained about Dixon, that Deputy Clerks under Dixon's supervision would lose documents, and that Dixon was unable "to effectively manage her office and perform her duties over the years." *Id*. at p. 6.

Importantly, Alcorn County is "not required to persuade the court that it was actually motivated by the proffered reasons. . . It must only clearly set forth, through the introduction of admissible evidence, the reasons for its decision." *Ruth*, 92 F. Supp. 3d at 532 (quoting *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 901 (5th Cir. 2012)) (additional citation and internal quotation marks omitted). This step involves no credibility assessment. *Heinsohn v. Carabin & Shaw, P.C.,* 832 F.3d 224, 236 (5th Cir. 2016). The Court finds that Alcorn County has satisfied its burden.

C.     *Pretext*

The burden now shifts back to Dixon to establish pretext. "At the third step, the employee must produce evidence, or rely on evidence already produced, that refutes or contests the employer's evidence of a legitimate, nondiscriminatory reason. Stated differently, the employee must produce or rely upon evidence that the employer's legitimate, non-discriminatory reason was only a pretext—that is, a false or weak reason . . . advanced to hide the actual . . . reason." *Id*. at 236-37 (citing BLACK'S LAW DICTIONARY (defining 'pretext'); *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)) (quotation marks omitted).

In her Response Memorandum [71], Dixon sets forth a laundry list of 21 different reasons which she contends establish Alcorn County's stated reasons for her termination were pretextual. However, some of the listed reasons can be easily disregarded at the outset. For example, one allegation is that "Judge McGee did not want Dixon to be the Justice Court Clerk because he was biased against older employees." [71] at p. 19. This constitutes a mere conclusory statement

8

insufficient to satisfy Dixon's burden to preclude summary judgment. *See*, *e.g.*, *Malone v. Colvin*, 2015 WL 475953, at *1 (N.D. Miss. Feb. 5, 2015) (quoting *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010)) ("Conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment."). In another listed reason, Dixon, citing only to her Amended Complaint [28], contends that "McGee stated that he would select deputy clerks who were young and blonde. [Docket 28, First Amended Complaint]." [71] at p. 19. Of course, a party cannot simply rely on allegations of her complaint to survive summary judgment. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325) ("[T]he nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.").

Setting aside these allegations which clearly fall below the requisite threshold to properly oppose summary judgment, the Court will turn to Dixon's other contentions. Dixon asserts that two members of the Board provided inconsistent statements under oath, which she believes establishes pretext. She also contends that McGee's alleged age animus toward her should be imputed to Alcorn County under the cat's paw theory. In essence, she contends that McGee harbored animosity toward her because of her age and influenced the Board to terminate her as a result of that animosity.

As to the inconsistent statements, Dixon points to the testimony of Supervisors Glidewell and Mitchell. Supervisor Glidewell signed an affidavit which in pertinent part provides:

> Prior to the Board meeting, I called Justice Court Judge Jimmy McGee in order to have him personally appear before the board to answer questions about the performance of Justice Court Clerk Jone Dixon. *Judge McGee did not ask for Ms. Dixon to be placed on the Board's agenda prior to the meeting. To my knowledge, Judge McGee had no knowledge of the Board's plans to discuss Ms. Dixon's job performance prior to May 7, 2018.* Judge McGee

> answered all questions to the best of his ability and did not offer any
> personal opinions as to the Board's decision on Ms. Dixon.

[70], Ex. 16 (emphasis added).

In his deposition, however, Supervisor Glidewell testified as follows:

> **Q.**    Do you recall back in May of 2018 Judge McGee requesting
> to talk to the board about Jone Dixon?
> **A.**    Are you referring to the executive session?
> **Q.**    Yes, sir.
> **A.**    Yes, sir.
> **Q.**    *And who did he – who decided he would be allowed to speak*
> *to the board in executive session?*
> **A.**    *Well, I mean, the request was made. The board made the*
> *decision whether to allow it or not.*
> **Q.**    Right.
> **A.**    It was accepted by the board.

[64], Ex. 4 at p. 6-7 (emphasis added).

Supervisor Mitchell executed a similar affidavit, which provides in pertinent part:

> *Prior to the Board meeting, the Board called Justice Court Judge*
> *Jimmy McGee that morning and requested that he personally*
> *appear before the Board for a personnel matter.* Judge McGee
> appeared and was asked questions regarding the performance of
> Justice Court Clerk Jone Dixon. *Judge McGee did not ask for Ms.*
> *Dixon to be placed on the Board's agenda prior to the meeting.* To
> my knowledge, Judge McGee had no knowledge of the board's
> plans to discuss Ms. Dixon's job performance prior to May 7, 2018.
> Judge McGee answered all questions to the best of his ability and
> did not offer any personal opinions as to the Board's decision on
> Ms. Dixon.

[70], Ex. 17 (emphasis added).

At his deposition, Supervisor Mitchell testified as follows regarding McGee's speaking to

the Board:

> Q.    Did you vote on him coming to speak?
> A.    Yes.
> Q.    *Did he request to come speak to the board?*
> A.    *Yes.*
> Q.    Did he ask you or do you know who he asked?

> A.    I don't recall.
> Q.    Were you aware of what he was going to talk about when he asked to attend the board meeting?
> A.    No.

[64], Ex. 5 at p. 12-13 (emphasis added).

Dixon takes the position that the Court should infer pretext based upon these conflicting explanations. In support, Dixon relies on the Fifth Circuit's analysis in *Hague v. Univ. of Tex. Health Science Ctr. at San Antonio*, 560 F. App'x 328, 336-37 (5th Cir. 2014). In *Hague*, the plaintiff's supervisor told the plaintiff that her contract was not being renewed due to budget cuts; however, the supervisor testified in his deposition that he did not renew the plaintiff's contract because he needed a person with a higher level of experience or education background to fill the plaintiff's position. *See id*.

Dixon attempts to analogize the Alcorn County Supervisors' inconsistent statements here to the inconsistent statements provided by the supervisor in *Hague*. While the Court understands this contention, it is also noteworthy that the differing explanations in the case at bar do not concern the specific reasons as to *why Dixon was terminated*. Rather, the inconsistencies relate to the manner in which McGee came before the Board. Though cognizant that the way in which McGee appeared before the Board of Supervisors certainly has some relevance, the Court also finds this distinction to be critical. Dixon has cited no case wherein an inconsistency of this nature alone has been deemed sufficient to establish pretext, and the Court finds that such a holding could create a slippery slope as every inconsistency related to any issue whatsoever could be deemed sufficient to survive summary judgment. However, recognizing that the manner in which McGee appeared before the Board does have *some* relevance, the Court does find that the inconsistency warrants *some* consideration.

The Court next turns to Dixon's contention that McGee's purported age animus toward her should be imputed to Alcorn County pursuant to the cat's paw theory. "Under the cat's paw theory, a subordinate employee's discriminatory remarks regarding a co-worker can be attributed to the workplace superior, ultimately the one in charge of making employment decisions, when it is shown that the subordinate influenced the superior's decision or thought process." *Haire v. Bd. of Supervisors of Louisiana State Univ. Agricultural and Mechanical College*, 719 F.3d 356, 366 n. 11 (5th Cir. 2013) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 421, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011)); *Roberson v. Alltell Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) ("To invoke the cat's paw analysis, [the plaintiff] must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker possessed leverage, or exerted influence, over the titular decision maker.") (citation and internal quotation marks omitted).

As noted above, Dixon contends that McGee harbored animosity toward her because of her age. She contends that his animus was shown by age-based comments. Dixon further asserts that McGee possessed leverage and exerted influence over the Board—the ultimate decisionmaker. Alcorn County claims that the cat's paw theory is inapplicable. As to the first prong of the theory, the County alleges that Dixon has not come forward with sufficient evidence to show that McGee harbored animosity toward her. Regarding the second prong, the County contends that it cannot be held liable because McGee is not an employee of the County.

Because it is potentially dispositive, the Court will first address the second prong—whether McGee's alleged discriminatory animus, *if established*, can be imputed to Alcorn County. On this point, Alcorn County contends that McGee's animus should not be imputed to it because McGee

is not an employee of the County but rather is an elected official. The County therefore contends that the rationale underlying the cat's paw theory would not be furthered by applying it here.

This Court has previously recognized the potential applicability of the cat's paw theory where an elected official exerts influence over a Board of Aldermen. *Washington v. City of Nettleton*, 2017 WL 888351 (N.D. Miss. Mar. 6, 2017). There, the plaintiff, Frederick Washington (a black male), filed suit against the City of Nettleton after he was terminated from his position as assistant chief of police. *Id*. at *1. Prior to his termination, Washington had complained to the police chief (Chief Heard) about an officer, Phillip Smith (a white male), for missing shifts without notice. *Id*. According to Washington, Smith then began spreading false rumors about Washington (one of which concerned Washington allegedly having a sexual affair with a parolee during his previous employment with the Mississippi Department of Corrections). *Id*. The Mayor of Nettleton, Jimmy Taylor, investigated the sexual affair allegation. *Id*. Following the investigation, Mayor Taylor met with Chief Heard about the allegations. *Id*. After the Chief Heard told Washington about that meeting, Washington delivered a letter to Mayor Taylor, accusing him of engaging in racial discrimination. *Id*.

A special meeting of the Board of Aldermen was called that same day. *Id*. at *2. "At the meeting, Chief Heard recommended to the Board of Aldermen that Washington be fired. There is disagreement regarding the reasons given for the termination in the meeting. Mayor Taylor alleges that Chief Heard cited 'poor performance,' while Chief Heard says that he recommended that Washington be fired for 'undermining his position.'" *Id*.

Washington filed suit against the City of Nettleton, Mayor Taylor, and Chief Heard, alleging that his termination was racially motivated. *Id*. As to his claim under Title VII, Washington invoked the cat's paw analysis on that basis that "by influencing Chief Heard, Mayor

13

Taylor was able to indirectly influence the Board's decision to terminate [Washington]." *Id*. at *6. Ultimately, this Court held that "Plaintiff has sufficiently shown that a genuine issue of material fact exists as to whether Defendant Mayor Taylor had leverage over Chief Heard, thereby effectuating the Board's decision to terminate indirectly." *Id*.

Here, Alcorn County argues that the rationale underlying the cat's paw doctrine is inapplicable because "[a] justice court judge is elected. The Alcorn County Board of Supervisors has no control over who the people elect to that position. Punishing a third party for the alleged discriminatory actions of a person that they do not control does not punish the proper person." [86] at p. 12. As an initial matter, *Washington*, a case wherein the cat's paw doctrine was deemed to apply when a mayor (an elected official) allegedly exerted influence over a Board of Aldermen, undercuts Alcorn County's argument. Further, although true that the Board of Supervisors "has no control over" who is elected as Justice Court Judge, the Court feels compelled to state the obvious—that the Board does have control over its handling of an employment matter. Here, viewing the evidence in the light most favorable to Dixon, the Board accepted McGee's allegations and immediately terminated her employment. The Board did so without addressing Dixon, a long-standing employee who had never been disciplined, about the allegations. In other words, the Board permitted McGee to influence it into making an employment decision. Taking into account the specific facts of this case and the alleged manner in which the Board handled this matter, it would be inequitable, in this Court's view, to simply permit the Board to escape any potential liability because McGee is not its employee. Alcorn County's argument on this point is rejected.

Having found that the cat's paw theory *could* apply, the Court looks to the other essential prong—whether McGee did in fact harbor discriminatory animus. "Animus requires evidence of a substantial, deeply held prejudice." *Tingle v. Merchants & Marine Bank*, 2019 WL 6529136, at

*5 (S.D. Miss. Dec. 4, 2019) (quoting *Roques v. Natchitoches Parish Sch. Bd.*, 583 F. App'x 466, 467 (5th Cir. 2014) (concurring, Jolly, G.)).

Dixon asserts that McGee made numerous age-based remarks. In particular, she testified as follows:

> Q. Okay. Now, in addition to some of the things we've already talked about, your Complaint also alleges that Judge McGee was biased against older employees. In what way was he biased?
>
> A. He always wanted us to hire young people, blonde people, young people. Because if a girl would come in and they would be real pretty up front and he'd be sitting over there he would make comments, you know.
>
> Q. What would he say?
>
> A. Well, that, you know, he was – that's the kind of person that we need to get in here and that kind of thing.
>
> Q. Did he say this to you?
>
> A. He said it out loud. Just if other people, whoever was in there, if you wanted to hear it you could. Or if you were on the phone you might not hear him. But he made remarks.
>
> Q. How many times do you think he made these remarks?
>
> A. Many times. Several times. Just at random. He wasn't there just a whole lot but he would make remarks.
>
> Q. So are we talking about five?
>
> A. More.
>
> Q. Ten?
>
> A. I can't say a specific number. Over the years he would –
>
> Q. So many more than five but less than ten?
>
> A. More than ten. He was always making comments.

[64], Ex. 8 at p. 61-62.

Alcorn County asserts that the alleged comments are mere stray remarks insufficient to preclude summary judgment. It is well settled that "[p]retext can be shown from age-based comments." *Cash v. Walgreen Co.*, 2020 WL 1846535, at *7 (N.D. Miss. Apr. 10, 2020) (citing *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997)). "Age-related remarks are relevant to determining whether age discrimination has occurred; however, mere 'stray remarks' such as 'a younger person could do faster work' or calling an employee an 'old fart' have been

held to be insufficient to establish discrimination." *Id.* (citing *Price*, 119 F.3d at 337) (additional citations omitted). "If a comment is used to show an intent to discriminate, 'the comment itself must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that the protected status was an impermissible factor in the employer's choice to make an adverse employment decision against the plaintiff.'" *Id.* (quoting *Comer v. Jesco, Inc.*, 1997 WL 671617, at *5 (N.D. Miss. Sept. 26, 1997)) (additional citations omitted).

Arguing that McGee's comments are insufficient, Alcorn County avers that they are mere stray remarks which "may just as easily have been a statement about the qualifications of the person standing in the clerk's office, their height, or what they were wearing – none of which would be illegal or discriminatory." [86] at p. 8. Although Alcorn County may ultimately prevail on that theory, this Court finds that a reasonable jury could conclude, without any inferences or presumptions, that McGee's numerous comments were age-based. In other words, this constitutes a question of fact that should be left to a jury—not this Court—to decide.

Dixon has come forward with sufficient evidence to create a genuine issue of material fact as to pretext. Therefore, Alcorn County's request for summary judgment on Dixon's ADEA claim is DENIED. Dixon will be permitted to proceed to trial on that claim.

## II.    *First Amendment Retaliation Claim Against Alcorn County*

Dixon also asserts a First Amendment retaliation claim against Alcorn County. Particularly, she contends that she "engaged in First Amendment protected speech in her communications to Greg Younger, and to the Board, about Judge McGee. Dixon [also] engaged in First Amendment protected speech in her communications with the Mississippi Commission on Judicial Performance about Judge McGee's misconduct." [71] at p. 23.

"The First Amendment protects freedom of speech and 'the right of the people . . . to petition the government for a redress of grievances.'" *Gibson v. Kilpatrick*, 838 F.3d 476, 481 (5th Cir. 2016) (quoting U.S. Const. Amend. I). To prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) [she] suffered an adverse employment action; (2) [her] speech involved a matter of public concern; (3) [her] interest in speaking outweighs the employer's interest in promoting efficiency in the workplace; and (4) [her] speech precipitated the adverse employment action." *Gibson*, 838 F.3d at 481 (quoting *Charles v. Grief*, 522 F.3d 508, 510 n. 2 (5th Cir. 2008)).

### A.   First Element - Adverse Employment Action

The first element is easily satisfied as Dixon suffered an adverse employment action when she was terminated from her employment with Alcorn County. *See, e.g.*, *Marchman v. Crawford*, 26 F. App'x 978, 985 (5th Cir. 2018) (quoting *Pierce v. Tex. Dep't of Criminal Justice, Inst. Div.*, 37 F.3d 1146, 49 (5th Cir. 1994) (additional citation omitted) ("Adverse actions include 'discharges, demotions, refusals to hire, refusals to promote, and reprimands.'").

### B.   Second Element - Speaking as a Citizen on a Matter of Public Concern

Regarding the second element, "[t]he [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Baker v. City of Tupelo, Miss.*, 2019 WL 2016536, at *5 (N.D. Miss. May 7, 2019) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)). As to this test, "instead of asking only if the speech at issue was on a matter of public concern, a court must first decide whether the plaintiff was speaking as a citizen disassociated with [her] public duties, or whether the plaintiff was speaking in furtherance

17

of the duties of his or her public employment." *Howell v. Town of Ball*, 827 F.3d 515, 522-23 (5th Cir. 2016) (citing *Garcetti*, 547 U.S. at 421).

    *i.*      *Whether Dixon spoke as a citizen*

In accordance with this precedent, the Court will first consider whether Dixon was speaking as a citizen or as an employee. "Only speech made in one's capacity as a citizen is entitled to First Amendment protection." *Id*. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. "To determine the role of the speaker 'courts review a number of factors, including the internal versus external nature of the speech, the employee's formal job description, whether the employee spoke on the subject matter of his or her employment, and whether the speech resulted from special knowledge gained as an employee. No one factor alone is dispositive.'" *Harris v. Noxubee Cnty., Miss.*, 350 F. Supp. 3d 592, 599 (S.D. Miss. 2018) (quoting *Johnson v. Hurtt*, 893 F. Supp. 2d 817, 829 (S.D. Tex. 2012)). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240, 134 S. Ct. 2369, 189 L. Ed. 2d 312 (2014). Ultimately, "the inquiry is a 'practical one,' and the controlling factor is whether the plaintiff's expressions were made pursuant to one of the numerous duties for which the plaintiff was employed." *Elizondo v. Parks*, 431 F. App'x 299, 303 (5th Cir. 2011) (citing *Garcetti*, 547 U.S. at 421).

Alcorn County's arguments understandably differ as to Dixon's comments to the Chancery Clerk and her communications with the Mississippi Commission on Judicial Performance. The Court will address them separately.

Concerning Dixon's comments to the Chancery Clerk, Alcorn County argues that they were simply "work complaints" related to her official duties. Alcorn County emphasizes portions of Dixon's deposition testimony wherein she explained that McGee's absences caused a significant strain on her and the other employees of the Clerks Office, as they would have to continue the cases and reset them for another day. For instance, Dixon testified that it "was a tremendous amount of extra work to get everything continued again." [66], Ex. 2 at p. 50. Thus, Alcorn County urges that Dixon's comments were simply made as an effort to obtain relief from additional workplace duties—not as a citizen.

In the Court's view, it is undeniable that the comments are at least related to Dixon's job duties. However, as emphasized above, this fact alone is insufficient, as the appropriate inquiry is whether the speech is "ordinarily within the scope of" Dixon's duties. *See Lane*, 573 U.S. at 240.

The duties and powers of Justice Court Clerks in Mississippi are statutorily defined in Mississippi Code Section 9-11-27, which provides in pertinent part:

> (1)   The board of supervisors of each county shall, at its own expense, appoint one (1) person to serve as clerk of the justice court system of the county . . . The clerk and deputy clerks shall be empowered to file and record actions and pleadings, to receive and receipt for civil and criminal cases, to certify and issue copies of all records, documents and pleadings filed in the justice court and to issue all process necessary for the operation of the justice court. . . All cases, civil and criminal, shall be assigned by the clerk to the justice court judges of the county in the manner provided in Section 11-9-105 and Section 99-33-2.

MISS. CODE ANN. § 9-11-27(1). Justice Court Clerks are also responsible for submitting various administrative reports to the Administrative Office of Courts. *See id*. at § 9-1-46(1).

As the Justice Court Clerk, Dixon's statutory duties and responsibilities did not include reporting misconduct of a Justice Court Judge nor seeking a replacement for a Judge who fails to appear for court. However, "[f]ormal job descriptions, although relevant, are not dispositive, as

they 'often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.'" *Elizondo*, 431 F. App'x at 303 (quoting *Garcetti*, 547 U.S. at 424-25). To the extent it is applicable, Dixon's job statutory duties and responsibilities favor her contention that the speech at issue was not part of her official duties. The Court recognizes, however, that this factor is not dispositive.

The Court next turns to whether the speech was internal or external. *See Harris*, 350 F. Supp. 3d at 599. Dixon's comments were made to the Chancery Clerk. While the Chancery Clerk is an internal figure to the extent that the position is held by an Alcorn County employee, it is external to the extent that the Chancery Clerk was not part of Dixon's typical chain of command.

As noted above, the appropriate inquiry is a "practical one." *See Elizondo v. Parks*, 431 F. App'x at 303 (citing *Garcetti*, 547 U.S. at 421). Applying a practical inquiry, the Court finds that questions of fact remain as to whether Dixon spoke as a citizen when she complained to the Chancery Clerk about McGee's work performance.

The Court also must consider whether Dixon's communications with the Commission constituted citizen speech. Alcorn County contends that Dixon was not speaking on a matter of public concern but was simply providing documents to the Commission as part of her duties as Justice Court Clerk.

As an initial matter, the Court notes that communicating with the Commission is not included in the statutory duties of a Justice Court Clerk. However, applying the "practical" inquiry, it appears to this Court that the Justice Court Clerk would be the likely person to provide such information to the Commission as part of an investigation. Stated differently, communicating with

the Commission was one of the duties that a Justice Court Clerk would likely be expected to perform, despite the fact that it is not included in her job description. *See Elizondo*, 431 F. App'x at 303 (citations omitted).

This Court finds instructive the Fifth Circuit's 2016 decision in *Howell*, 827 F.3d 515. There, Thomas Howell, a police officer for the town of Ball, Louisiana, learned that Ball's Mayor, Chief of Police, and other municipal employees were involved in a FEMA fraud scheme. *Id*. at 520. Howell reported the misconduct to the FBI and assisted with the investigation by acting as a confidential informant. *Id*. The investigation was successful, and multiple municipal employees, including the Chief of Police, were indicted. *Id*. The new Chief of Police learned of Howell's involvement in the investigation and, shortly thereafter, an internal investigation was opened regarding Howell's purported theft of property from a coworker. *Id*. After he was terminated, Howell filed suit, alleging that "the defendants violated his First Amendment rights when they fired him for providing information to the FBI, and for otherwise participating in the FBI investigation as a confidential informant. *Id*. at 521.

On appeal, the Fifth Circuit analyzed whether the district court's grant of summary judgment in the Town of Ball's favor was appropriate. *Id*. at 522. The Fifth Circuit ultimately reversed the district court and on the second element held as follows:

> Howell has offered evidence that his involvement in the FBI investigation was outside the ordinary scope [of] his professional duties. . . Howell's statements to the FBI were made outside the normal chain of command and without the knowledge or permission of anyone else in the police department. . . Indeed, the confidential nature of Howell's speech alone suggests that it was not part of his "ordinary" professional duties; the FBI did not ask for any assistance from the Ball Police Department, and Howell was forbidden from telling anyone at the department that he was aiding the FBI by recording town officials' conversations, since doing so would have compromised the investigation.

21

. . .

> In sum, Howell asserts that it was never part of his normal job duties, secretly and without departmental authorization, to aid in an FBI investigation of coworkers and superiors, much less to record surreptitiously coworkers' conversations at the FBI's request. The defendants offer no evidence to the contrary, other than the all-encompassing, judicially established general description of a police officer's professional responsibility in the state of Louisiana, which, as we have stated, cannot be considered dispositive. Accordingly, the district court erred in finding that Howell's involvement in the FBI investigation was in furtherance of his ordinary job duties, and thus was not entitled to First Amendment protection.

*Id*. at 523-24 (internal citations and quotations omitted).

For purposes of summary judgment, the Court finds particularly pertinent the fact that Dixon allegedly provided the Commission with *additional* information related to *other* cases which were not specifically requested by the Commission. As stated by Dixon, she "did more than merely comply with a request to provide documents. [She] informed the Commission that there were additional cases that Judge McGee similarly had never decided." [71] at 27. Allegations on this point were included in Dixon's Affidavit. *See* [70], Ex. 12. The Court finds this clarification to be critical. Although not completely analogous to the facts and circumstances of *Howell*, the Court does find that the additional allegations and information which Dixon purportedly provided to the Commission to be important on this point. Like *Howell*, Dixon voluntarily provided information to an outside agency as part of an investigation into the conduct of an elected official with whom she worked closely.

Applying the "practical" approach once again, the Court finds that Dixon has carried her summary judgment burden as to whether she spoke as a citizen when communicating with the Commission.

ii.      *Whether the Speech Involved a Matter of Public Concern*

The second component of this element concerns whether the citizen's speech involved a matter of public concern. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Gibson*, 838 F.3d at 482 (quoting *Lane v. Franks*, 573 U.S. 228, 241, 134 S. Ct. 2369, 189 L. Ed. 2d 312 (2014); *Snyder v. Phelps*, 562 U.S. 443, 453, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011)) (internal quotation marks omitted). "Public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id*. (quoting *Connick*, 461 U.S. at 147-48). "An employee's speech may contain an element of personal interest and yet still qualify as speech on a matter of public concern." *Brown v. Leflore Cnty., Miss.*, 150 F. Supp. 3d 753, 762 (N.D. Miss. Dec. 15, 2015) (quoting *Harris v. Victoria Ind. Sch. Dist.*, 168 F.3d 216, 222 (5th Cir. 1999)).

"It is well established that speech exposing or otherwise addressing malfeasance, corruption or breach of the public trust, . . . touches upon matters of public concern." *Id*. at 764 (quoting *Graziosi v. City of Greenville, Miss.*, 775 F.3d 731, 738 (5th Cir. 2015)); *see also Branton v. City of Dallas, Tex.*, 272 F.3d 730, 740 (5th Cir. 2001) ("There is perhaps no subset of matters of public concern more important, [for purposes of First Amendment protection of speech of public employees,] than bringing official misconduct to light.") (citations omitted).

Dixon's comments related to an elected official's purported failure to appear for work and properly carry out his job duties. Although McGee's failure to appear for court did negatively impact Dixon by creating more work for her to complete, that alone is insufficient to negate the

fact that it addressed a matter of public concern. *See id.* at 762. At a minimum, questions of fact remain as to this element.

    C.    *Third Element - Balancing of the Interests*

"So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Santoyo v. Village of Hessemer*, 2020 WL 8087936, at *4 (W.D. La. Nov. 24, 2020) (citing *Garcetti*, 547 U.S. at 419). "[T]he speech is only protected if the employee's interest in expressing himself outweighs the government's interest in promoting the efficiency of its services." *Harris v. Tunica Cnty., Miss.*, 2016 WL 4499525, at *4 (N.D. Miss. Aug. 25, 2016) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)). Relevant factors in this analysis are "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regulator operation of the enterprise." *Anderson v. Tupelo Reg. Airport Auth.*, 967 F. Supp. 2d 1127 (N.D. Miss. 2013) (quoting *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987)).

Alcorn County does not argue this element in its Motion [64], and the Court therefore sees no need to address it in great detail. The Court simply notes that Dixon's speech was aimed at attempting to correct inefficiencies and did not impact Alcorn County's ability to operate efficiently and effectively. Dixon has provided sufficient evidence to preclude summary judgment on this point.

D.     *Fourth Element – Whether the Speech Precipitated the Adverse Employment Action*

"To establish causation, Plaintiff must prove that his protected conduct 'was a motivating factor in' Defendants' termination of his employment." *Wilson v. City of Hattiesburg*, 396 F. Supp. 3d 711, 718 (S.D. Miss. June 10, 2019) (quoting *Dearman v. Stone Cnty. Sch. Dist.*, 832 F.3d 577, 581 (5th Cir. 2016)). Here, Alcorn County concedes that "[i]f the Court finds that the speech is protected, Alcorn [County] does not contend that Dixon can raise a disputed issue of fact regarding causation[.]" [65] at p. 15.

Because Alcorn County admits that Dixon can satisfy this element for summary judgment purposes, the Court sees no need to address it any further.

E.     *Additional Defenses Raised by Alcorn County*

Alcorn County raises two additional defenses. The first relates to the causation issue. Particularly, the Fifth Circuit has held that "[e]ven if speech on a matter of public concern was a substantial or motivating factor in the termination, a defendant may escape liability by demonstrating that it would have taken the same action in the absence of the protected conduct." *Beattie*, 254 F.3d at 603. Alcorn County contends that this defense applies here. Second, Alcorn County contends that Dixon cannot establish that municipal liability should apply. The Court will address these arguments in turn.

As to the first argument, Alcorn County contends that liability cannot attach because the Board would have taken the same employment action in the absence of Dixon's speech. In *Beattie*, the Fifth Circuit held "[i]f there is no evidence that the board knew of the protected activity, [the plaintiff] cannot show that the activity motivated retaliatory behavior." *Id*. at 604. Relying on this language, Alcorn County argues:

> As discussed above, Dixon's complaints about Judge McGee's attendance is not protected speech. But even if it was, Dixon

25

> provides no evidence that any Board member knew of it. The same
> is true about Dixon and the judicial committee; even if this Court
> finds it was protected speech, which it was not, there is no evidence
> anyone on the Board knew about it. Dixon was specifically asked if
> she ever told anyone with Alcorn County about speaking to the
> judicial commission. Dixon said no, because the judicial committee
> told people not to say anything. As such, there is no evidence that
> the board was aware of either complaint.

[65] at p. 16.

This argument can easily be rejected for summary judgment purposes, as questions of fact remain. For example, although Alcorn County states that there was no evidence that the Board knew of her complaints about McGee's attendance, Younger specifically testified that this is something that he normally would have told the Board. Ultimately, whether the Board would have taken the same action constitutes a question of fact for a jury to decide.

Alcorn County's second argument is that Dixon has "failed to identify any policy or custom that was the moving force behind the alleged violation of her First Amendment rights." [65] at p. 17.

It is well-established that municipal liability under Section 1983 "may not be found on a theory of *respondeat superior*, but instead must be premised upon 'some official action or imprimatur.'" *Smith v. City of Madison, Miss.*, 364 F. Supp. 3d 656, 664 (S.D. Miss. Oct. 23, 2018) (quoting *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). For municipal liability to attach, there must be "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski*, 237 F.3d at 578 (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978)). "Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Id*.

(citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 n. 3 (5th Cir. 1984)) (additional citations omitted). "A single decision, such as the decision to terminate a municipal employee, may therefore create municipal liability only where the decision is made by a final policymaker or the improper motive can be imputed to the final policymaker." *Smith*, 364 F. Supp. 3d at 664 (citing *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008); *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005); *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 603 (5th Cir. 2001)).

There appears to be no dispute between the parties that the Board is the final policymaker with respect to employment decisions. This is consistent with *Smith*, wherein the parties "agree[d] that the Board [was] the final policymaker with regard to employment decisions." 364 F. Supp. 3d at 664.

On that point, the Fifth Circuit has held that "[i]f there is no evidence that the board knew of the protected activity, [the plaintiff] cannot show that the activity motivated retaliatory behavior." *Beattie*, 264 F.3d at 604. Similarly, the District Court for the Southern District of Mississippi, citing *Beattie*, has noted that "[i]n general, without a showing that the Board had actual knowledge of the alleged improper basis of the Mayor's termination recommendation, the Board cannot be liable for the alleged retaliation." *Smith*, 364 F. Supp. 3d at 664 (citing *Beattie*, 254 F.3d at 604). However, there is an exception to this general proposition:

> There is an exception to this rule where the final policymaker's decision is merely a "rubber stamp." If an employee can demonstrate that the subordinate's evaluation was tainted by an illegal intent and that it had sufficient influence or leverage over the ultimate decision maker, the motives of the subordinate become relevant.

*Id*. (quoting *Beattie*, 254 F.3d at 604 n. 14; citing *Rios v. Rossotti*, 252 F.3d 375, 381-82 (5th Cir. 2001)).

Alcorn County contends that the "rubber stamp" exception is inapplicable here. In particular, the County argues that "[i]t was only after *both judges* confirmed the most concerning allegations, that Dixon was signing judgments and opening court on her own, that the Board voted to terminate her. The Board decision was based on the testimony of **two (2) judges**, not the alleged discriminatory animus of one (1) man." [65] at p. 18-19 (emphasis in original).

In other words, Alcorn County relies on the fact that the Board considered not only McGee's allegations but also those of Little. The Court, however, finds portions of Little's deposition testimony to call Alcorn County's contentions into question. For example, he testified that he did not recall any issues with Dixon's job performance:

> Q.   Did you have any issue with Ms. Dixon when she was a deputy clerk?
> A.   Nothing that I can think of. I can't remember. Nothing that we didn't work out on our own, you know.
>
> . . .
>
> Q.   Well, did you have any issue with her, with her work performance or not doing what you asked her to do or anything? As far as you recall you had no issues with her?
> A.   (Witness shakes head negatively.) Nothing that I can remember.
> Q.   Once she became the justice court clerk did you have any issues with her job performance?
> A.   No.

[64], Ex. 2 at p. 8-9.

When questioned about his participation in the May 7, 2018 executive session meeting, Little testified:

> Q.   Do you recall in May of 2018, the testimony has been that you participated by phone for an executive board meeting that Judge McGee was at concerning Jone Dixon.
> A.   I was.
> Q.   Tell me what you recall about that.

28

A.     If I remember right, that has been what, nearly three years ago –

Q.     Coming up on three years.

A.     Greg Younger called me and put me on speakerphone. I don't remember how the conversation actually played out, but – let's see. I remember there was an incident that Ms. Jone started court without me while I was on the telephone in my office, and I affirmed that. There was one other question, but I cannot remember what it was.

Q.     There was only two questions that were asked of you?

A.     There were two questions.

Q.     And tell me about this starting court while you were on the phone in your office.

A.     It was civil court and I was on the phone in my office and we were running late and she got started calling out some of the of the cases that were unopposed. And I told her that she didn't need to start without me, you know, I needed to be in there on those cases too. But we worked that out. There was no problem.

Q.     And that was only one time this happened?

A.     Yes, as far as I know.

Q.     And do you recall approximately how many years or months? Was it recent to this phone call or did it happen years before?

. . .

A.     Years prior. . .

[64], Ex. 2 at p. 9-10.

In addition, Little testified that while he did not have any strong opposition to it, he "wasn't for her being terminated." [65], Ex. 2 at p. 14.

This testimony gives the Court some pause. Although by Little's own account he did confirm some of the events which were purportedly the basis for her termination, his characterization of his statements during the executive session differs from Alcorn County's contentions. In fact, he even testified that he was not in favor of the termination. Additionally, the Court notes that, despite the fact that Dixon had worked for Alcorn County for almost two decades without having been the subject of any disciplinary actions, the Board did not discuss the

allegations with her nor give her an opportunity to explain her actions. This weighs in favor of the Board's decision being a mere rubber stamp.

The Court finds there is sufficient evidence from which a jury could reasonably find that the Board rubber stamped McGee's purportedly tainted recommendation to terminate Dixon's employment. *See Smith*, 364 F. Supp. 3d at 665 ("Accordingly, the Court finds that Smith has produced sufficient evidence from which a properly instructed jury could find that the Board merely rubber stamped the Mayor's allegedly tainted termination recommendation."). Stated differently, questions of fact remain.

For the reasons set forth above, the Court finds Dixon has come forward with sufficient evidence to preclude summary judgment on her First Amendment retaliation claim against Alcorn County. She will be permitted to proceed to trial on that claim.

### III.    *First Amendment Retaliation Claim Against Jimmy McGee*

Dixon also brings a First Amendment retaliation claim against McGee in his individual capacity. This claim is based upon the same speech forming the basis of her claim against Alcorn County—specifically, Dixon's comments to Younger and her communications with the Mississippi Commission on Judicial Performance. In response, McGee raises the defense of qualified immunity.

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Zadeh v. Robinson*, 928 F.3d 457, 463-64 (5th Cir. 2019) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370-71 (5th Cir. 2011)). "Officials are entitled to qualified immunity unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." Id. at 464 (quoting *Dist. of Columbia v. Wesby*, --- U.S. ---, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453

(2018); *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)) (internal quotation marks omitted). Stated differently, qualified immunity may be successfully invoked by a governmental official "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Waddell v. Voyles*, 2021 WL 1208497, at *4 (N.D. Miss. Mar. 30, 2021) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)) (additional citation omitted).

McGee's request for summary judgment addresses only the second prong—whether the unlawfulness of his conduct was clearly established at the time. It is well-established that a court may conduct the two-pronged inquiry in any order. *See Crostley v. Lamar Cnty., Tex.*, 717 F.3d 410, 422 (5th Cir. 2013) (citation omitted). However, the Fifth Circuit has "repeatedly emphasized that there is value in addressing both questions 'to develop robust case law on the scope of constitutional rights.'" *Roque v. Harvel*, 993 F.3d 325, 332 (5th Cir. 2021) (quoting *Joseph v. Bartlett*, 981 F.3d 319, 331 n. 40 (5th Cir. 2020)) (additional citation omitted). In this case, since Dixon's First Amendment retaliation claim against McGee arises from the same underlying facts as the claims against the County and the Court has already analyzed that claim above, the Court will move directly to the second prong—whether the right at issue was clearly established at the time of McGee's conduct.

The Fifth Circuit has noted that this "second question—whether the officer violated clearly established law—is a doozy. The § 1983 plaintiff bears the burden of proof. And the burden is heavy: A right is clearly established only if relevant precedent 'has placed the . . . constitutional question beyond debate.'" *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (citing *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018); (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). The pertinent question is whether "the state

of the law at the time of the incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Kimbriel v. City of Greenville, Miss.*, 647 F. App'x 353, 356 (5th Cir. 2016) (quoting *Cass v. City of Abilene, Tex.*, 814 F.3d 721, 728 (5th Cir. 2016); *Tolan v. Cotton*, 572 U.S. 656, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)) (internal quotation marks omitted). Since the relevant inquiry concerns whether the official had fair warning, "reasonableness is judged against the backdrop of the law *at the time of the conduct*." *Tucker v. City of Shreveport, La.*, 998 F.3d 165, 173 (5th Cir. 2021) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)) (emphasis added).

McGee takes the position that "it was not clearly established law that a nondecision maker like Judge McGee could be liable for First Amendment retaliation on the date of the Plaintiff's termination, thus, Judge McGee is entitled to qualified immunity." [67] at p. 9. To adequately address this issue, the Court finds it necessary to survey various Fifth Circuit cases in this area.

This Court will begin with the Fifth Circuit's 1986 decision in *Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748 (5th Cir. 1986). There, Norman Jett (a white male) was the athletic director and head football coach at South Oak Cliff High School in Dallas, Texas. *Id.* at 751. Frederick Todd (a black male) was the principal at South Oak Cliff. *Id.* After one of South Oak Cliff's football games, Jett berated the officials, and "[o]ther controversies erupted over this game, including a reporter's accusations that Jett and other coaches were bribed, players' complaints that the game plan was not followed, and coaches' complaints that non-school personnel were allowed in the booth." *Id.* Further, in another incident, Jett was quoted in the local newspaper as stating that only two athletes from the school could meet the NCAA academic eligibility requirements. *Id.* Todd ultimately sent a letter to John Kincaide, the school district's director of athletics, "recommending Jett's removal based on poor leadership performance, his inability to plan

adequately, and the events surrounding the [above-referenced] game." *Id*. After various meetings between school district personnel, Linus Wright (the school district superintendent) accepted Todd's recommendation and removed Jett from his position as the South Oak Cliff head football coach and athletic director. *Id*. at 752.

Jett brought suit against the school district and Todd, in his individual and official capacity, for unlawful termination based on race and in violation of his First Amendment rights. *Id*. After a jury rendered a verdict in Jett's favor, one of the issues on appeal was whether Todd could be held individually liable in light of the fact that he was not the final decisionmaker as to Jett's reassignment. *Id*. at 758. The Fifth Circuit held that "[e]ven though Todd lacked the final authority to reassign Jett, the jury found, on adequate evidence, that Wright's reassignment decision was based on Todd's recommendation and that Jett suffered damages proximately caused by Todd's challenged action." *Id*. The Fifth Circuit squarely rejected Todd's argument that he could not be held liable because he "had only recommending authority." *Id*.

In 2004, the Fifth Circuit decided *Johnson v. Louisiana*, 369 F.3d 826 (5th Cir. 2004). There, the Fifth Circuit held "only final decision-makers may be held liable for First Amendment retaliation employment discrimination under § 1983." *Id*. at 831. In reaching that conclusion, the Fifth Circuit cited its earlier 2001 decision in *Beattie*, 254 F.3d at 602, 603, 605. Particularly, the Fifth Circuit explained:

> In *Beattie*, the plaintiff alleged that the principal and superintendent of the school in which she worked, in retaliation for her support of an opposing candidate for superintendent, recommended to the school board that she be discharged. We found that even were the plaintiff's allegations true, the principal and the superintendent could not be liable under § 1983 if they did not make the final decision to discharge her, "no matter how unconstitutional their motives."

*Id*. (citing *Beattie*, 254 F.3d at 601, 605) (internal citations omitted).

That brings the Court to the Fifth Circuit's 2018 decision in *Sims v. City of Madisonville, Tex.*, 894 F.3d 632 (5th Cir. 2018).[3] *Sims* was decided on June 28, 2018—less than two months *after* Alcorn County terminated Dixon's employment. There, a former police officer (Sims) filed suit against the City of Madisonville and Sergeant Jeffrey Covington, alleging that he was terminated in violation of his First Amendment rights after he reported up the chain of command that Covington had solicited help form other officers in planting drugs on Covington's wife during a custody battle over their children. *Id*. at 636. At some point thereafter, Sims learned that Covington was investigating him and then searched the network computer and located the investigative file. *Id*. at 636-37. Police Chief Claude May later learned about Sims accessing the files, and, once it was confirmed that there had been a data breach which originated from Sims' computer, Chief May terminated Sims' employment for violating the department's computer use agreement. *Id*. at 637. Sims ultimately sued the City and Covington pursuant to 42 U.S.C. § 1983, alleging a conspiracy to violate his First and Fourteenth Amendment rights. *Id*.

The district court granted Covington's request for summary judgment on the basis of qualified immunity, citing the Fifth Circuit "holding in *Culbertson v. Lykos*, 790 F.3d 608 (5th Cir. 2015), that the law [was] 'unsettled . . . whether someone who is not a final decision maker and makes a recommendation that leads to the plaintiff being harmed can be liable for retaliation.'" *Id*. In other words, the district court held that the law was not clearly established and therefore granted qualified immunity. *Id*.

---

[3] There were undoubtedly multiple other cases on this topic decided during this time period, some of which are addressed below. The Court, however, finds it unnecessary to reference each and every opinion in this area.

On appeal, the Fifth Circuit provided an extensive explanation of the uncertainty in this area of the law at that time. *Id*. at 641. The Fifth Circuit then condemned its prior holdings in *Beattie* and *Johnson*:

> *Beattie*, *Johnson*, and subsequent cases thus inadvertently created the uncertainty we have recognized in this area. We now provide the overdue clarification. Because it is at odds with our earlier holding in *Jett*, *Johnson*'s absolute bar on First Amendment liability for those who are not final decisionmakers is not binding. . . *Jett*'s "causal link" standard sets the causation requirement for a suit against an individual defendant with retaliatory motives who does not make the final employment decision.

*Id*. (citations omitted).

The Fifth Circuit thus made clear that *Jett* controls, and non-final decisionmakers may be held liable. However, the Fifth Circuit affirmed the district court's grant of qualified immunity, specifically holding "[a]though today's decision clarifying that *Jett* controls means the law will no longer be 'unsettled' in this area, it provides no recourse to Sims. That is because of the second part of the qualified immunity inquiry, which requires a plaintiff to show that any violation of rights was clearly established at the time the conduct occurred." *Id*. (citations omitted). The Fifth Circuit ultimately held "[i]f judges have mixed up principles of individual and municipal liability in this area and failed to recognize Jett as the controlling decision, law enforcement officials should not be expected to have a more nuanced understanding of section 1983 law." *Id*.

McGee strongly emphasizes the Fifth Circuit's own recognition that, prior to *Sims* (which was decided *after* the employment decision at issue), the law was "unsettled . . . whether someone who is not a final decision maker and makes a recommendation that leads to the plaintiff being harmed can be liable for retaliation." *Sims*, 894 F.3d at 637.

Dixon opposes this argument and directs the Court to a 2020 (post-*Sims*) decision from the District Court for the Eastern District of Texas. *See Bevill v. City of Quitman, Tex.*, 2020 WL

1065430 (E.D. Tex. Mar. 5, 2020). There, the plaintiff, Terry Bevill, was the Captain of the Quitman Police Department and an instructor at the Kilgore Police Academy. *Id*. at *1. A man named David McGee, a former jail administrator in Wood County, was charged with facilitating or permitting the escape of an inmate from the Wood County jail and tampering with government records during his employment. *Id*. McGee did not believe that he could receive a fair trial in Wood County and therefore filed a motion to change venue. *Id*. At the request of McGee and McGee's counsel, Bevill signed an affidavit which was filed in support of the motion. *Id*. The affidavit set forth two main reasons as to why the venue should be changed: "(1) pretrial publicity, and (2) alleged personal relationships between Sheriff Tom Castloo, Wood County District Attorney James Wheeler, and State District Judge Jeff Fletcher." *Id*. According to Bevill, Sheriff Castloo, DA Wheeler, and Judge Fletcher then met with Quitman Mayor (David Dobbs), "threaten[ing] to retaliate against the city of Quitman by withholding Wood County resources and support for Quitman PD if [Bevill] was not fired for the affidavit he signed in support of [McGee's] motion." *Id*. at *2. After being placed on administrative leave pending an internal investigation, Bevill was terminated. *Id*. When Quitman Police Chief Kelly Cole advised Bevill of the termination, Chief Cole presented the investigation's findings, which revealed that Bevill's actions violated Quitman PD policies. *Id*. For the sake of clarity, the Court notes that the employment decision in Bevill was made on June 21, 2017—thus, like the employment decision in the present case, prior to the Fifth Circuit's decision in *Sims*.

After Bevill filed suit alleging a violation of his First Amendment rights, the individual defendants raised the defense of qualified immunity, citing *Sims* and contending that, even if Bevill's First Amendment rights were violated, the law was not clearly established at the time of the adverse employment decision. *Id*. The District Court for the Eastern District of Texas rejected

this contention. *Id*. at *9. Because it is critical, this Court will quote a significant portion of that opinion below:

> That is, the precise contours of First Amendment retaliation liability in this context were not settled until the *Sims* decision in 2018. With *Sims* and its predecessors in mind, the Court turns now to this case. Plaintiff claims that he was fired on June 21, 2017, which was prior to the Sims decision. Thus, to the extent that *Sims* and its predecessors are applicable to the facts in the present case, Plaintiff's First Amendment retaliation claim would be foreclosed on the ground that, at the time of the alleged violation, it was not clearly established that a non-final decisionmaker could be held liable. But the Court finds the present case readily distinguishable from *Sims* and its predecessors.
>
> Specifically, as Plaintiff observes, *Pennypacker*, *Culbertson*, *Howell*, and *Sims* all involved retaliatory employment termination in the context of an employment relationship. In other words, they all involved, in one form or another, a plaintiff's attempt to hold a *subordinate* employee liable for influencing a *supervisor's*—the final decision maker's—decision to terminate the plaintiff. It is in that context that *Sims* really helps clarify the Fifth Circuit's jurisprudence, allowing the imposition of liability on a subordinate employee in certain circumstances when the subordinate's retaliatory animus sets into motion a series of events that culminates in an adverse employment action—executed by the supervisor or employer with final decisionmaking authority—in violation of the First Amendment. But neither *Sims*, nor its predecessors, contemplated the situation in which a government employee, because of retaliatory animus, uses his or her position to influence a third-party employer to terminate one of its employees for exercising his or her First Amendment rights. That situation is instead contemplated by *Kinney*, in which the Court held in 2004 that it had long been clear that a government official cannot seek to influence the employer of an ordinary citizen to fire him or her in retaliation for giving 'unwelcome testimony.' The facts here are thus more akin to those in *Kinney* than those in *Sims* and its predecessors; accordingly, the Court is satisfied that it was clearly established at the time Plaintiff was fired from Quitman PD that DA Wheeler's, Judge Fletcher's, and Sheriff Castloo's conduct violated Plaintiff's constitutional rights.

*Id*. at *9 (citations omitted).

Dixon urges this Court to adopt the same logic—particularly, that the pre-*Sims* confusion surrounding potential liability for non-final decisionmakers was only related to subordinate employees, not third parties such as McGee. In Dixon's view, the law has been clearly established that third parties could be held liable in this context ever since the Fifth Circuit's 2004 decision in *Kinney*, wherein the Fifth Circuit held that third party police officials could potentially be held individually liable for First Amendment retaliation. *See Kinney*, 367 F.3d at 368 ("More fundamentally, we reject the Police Officials' suggestion that it would have been reasonable for officers in their positions to believe that they were unfettered by the First Amendment merely because their economic relationship with [the plaintiffs] was non-employment and non-contractual.").

When the parties initially briefed the present Motion [66], *Bevill* was on appeal at the Fifth Circuit. The Fifth Circuit recently decided that case and affirmed the decision of the District Court of the Eastern District of Texas. *See Bevill v. Fletcher*, --- F.4th ---, 2022 WL 420752 (5th Cir. Feb. 11, 2022). In its opinion, the Fifth Circuit explained in detail the confusion in this area of the law but also noted that "a fairer reading of *Kinney* is that it clearly establishes the right of a plaintiff to be free from governmental officials' exerting their power or influence over a third-party employer to cause the plaintiff to be terminated for exercising his First Amendment rights. . . In sum, the district court correctly determined that Bevill's First Amendment right was clearly established at the time it was violated." *Id*. at *9.

In other words, the Fifth Circuit held that Dixon's right to be free from a third-party governmental official exerting power or influence over her employer due to her exercise of her constitutional rights has been clearly established since *Kinney* was decided in 2004. The Court finds that the same logic should be applied here. While cognizant that the Fifth Circuit has

consistently cautioned district courts deciding qualified immunity issues to consider the state of the law at the time of the subject conduct as opposed to looking at post-conduct judicial decisions, the Court again notes that the Fifth Circuit's decision in *Bevill* concluded that the law in this area has been clearly established since *Kinney* was decided in 2004. *See id.*; *Tucker*, 998 F.3d at 173. This fact distinguishes this case from a typical case. Consequently, for the same reasons articulated by the Fifth Circuit in *Bevill*, the Court finds the law was clearly established at the time of McGee's pertinent alleged conduct.[4]

Dixon has carried her burden as to the second qualified immunity prong, and McGee is therefore not entitled to qualified immunity. Dixon will be permitted to proceed to trial on her First Amendment retaliation claim against him in his individual capacity.

IV.    *Malicious Interference with Employment Claim Against Jimmy McGee*

Finally, Dixon asserts a claim for malicious interference with employment against McGee. In order the prevail on a malicious interference claim, a plaintiff must establish the following elements:

> 1. that the acts were intentional and willful; 2. that they were calculated to cause damage to the plaintiffs in their lawful business; 3. that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and 4. that actual damage and loss resulted.

---

[4] The divided panel of the Fifth Circuit issued its opinion in *Bevill* on February 11, 2022. Although a petition for rehearing en banc has not been filed as of today's date, the Fifth Circuit granted an extension of the deadline to do so. This Court is well-aware that, should a petition for rehearing en banc be granted, the panel opinion would be vacated. *See, e.g.*, *Comer v. Murphy Oil USA*, 607 F.3d 1049, 1053 (5th Cir. 2009) (citing 5th Cir. R. 41.3) ("The grant of rehearing en banc in this case vacated the panel opinion and judgment of the court and stayed the mandate.") (internal quotation marks and additional citation omitted); *see also U.S. v. Seale*, 577 F.3d 566, 570 (5th Cir. 2009) ("The grant of the petition for rehearing en banc had the effect of vacating the unanimous panel opinion and rendering it non-precedential.") (citation omitted). However, as of now, the panel opinion is a binding decision which this Court must follow. Further, this Court adopts the underlying rationale of the majority in the panel opinion. Should the petition for rehearing be granted and an en banc opinion be issued reaching a different outcome, the parties should immediately notify the Court. Appropriate steps will be taken at that time.

*Rex Distributing Co., Inc. v. Anheuser-Busch, LLC*, 271 So.3d 445, 452-53 (Miss. 2019) (quoting *Cenac v. Murry*, 609 So.2d 1257, 1268-69 (Miss. 1992)). Setting aside these elements, however, "[o]ne occupying a position of responsibility on behalf of another is privileged to interfere with his principal's contractual relationship with a third person, as long as [he] is acting within the scope of that responsibility and absent bad faith." *Jones*, 100 So.3d at 497-98 (quoting *Shaw v. Burchfield*, 481 So.2d 247, 254-55 (Miss. 1985)) (internal quotation marks omitted); *see also Jones v. Gulf Coast Restaurant Group Inc.*, 2021 WL 232127, at *5 (S.D. Miss. Jan. 22, 2021). On this point, a person who occupies a position of responsibility as to the plaintiff's employment enjoys this privilege "unless [the actions] were taken in bad faith." *Morrison v. Miss. Enterprise for Tech., Inc.*, 798 So.2d 567, 574 (Miss. Ct. App. 2001). In other words, the privilege only applies when the superior is acting "within the scope of that responsibility and absent bad faith." *Dearman v. Stone Cnty. Sch. Dist.*, 2014 WL 1153068, at *8 (S.D. Miss. Mar. 21, 2014).

McGee contends that he "occupies a position of responsibility on behalf of the County and was operating within the scope of that responsibility." [67] at p. 15. Particularly, he asserts that he was called upon by the Board of Supervisors to provide information related to a personnel matter and that he simply complied with that request. On the other hand, Dixon contends that although McGee was the Justice Court Judge, he was not her supervisor and thus was not privileged to interfere with her employment.

The Court finds this dispute to be a non-factor because, even if the privilege applies, Dixon has come forward with sufficient evidence to survive summary judgment as to bad faith. Viewing the evidence in the light most favorable to Dixon, McGee was aware that she had complained about him to Chancery Clerk Younger and that she had cooperated with the Mississippi Commission on Judicial Performance involving an investigation into McGee. Although the

background as to how McGee appeared before the Board is in dispute, there is no dispute that McGee in fact appeared and made allegations regarding Dixon's job performance which ultimately led to her termination. Viewing the evidence in the light most favorable to Dixon, a reasonable jury could find that he acted in bad faith. Summary judgment is therefore not appropriate on Dixon's malicious interference with employment claim, and she will be permitted to proceed to trial on that claim.

*Conclusion*

For the reasons set forth above, Alcorn County's Motion for Summary Judgment [64] is DENIED. Jimmy McGee's Motion for Summary Judgment [66] is also DENIED. Dixon shall be permitted to proceed to trial on all claims.[5]

SO ORDERED this the 1st day of March, 2022.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE

---

[5] However, as noted above, to the extent that Dixon asserted an official capacity claim against McGee, it is dismissed as duplicative.